J-S09043-19

2020 PA Super 18

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| EDWARD D. WILSON, | : | |
| | : | |
| Appellee | : | No. 1458 WDA 2018 |

Appeal from the Order Dated September 20, 2018
in the Court of Common Pleas of Armstrong County
Criminal Division at No(s): CP-03-MD-0000237-2018

BEFORE:    PANELLA, P.J., LAZARUS, J. and STRASSBURGER, J.*

OPINION BY STRASSBURGER, J.:    **FILED JANUARY 31, 2020**

The Commonwealth appeals from the order dated September 20, 2018. In that order, the trial court *sua sponte* vacated its July 23, 2018 judgment, which found Edward D. Wilson (Wilson) guilty of indirect criminal contempt (ICC) for violating an emergency order entered pursuant to the Protection from Abuse (PFA) Act, 23 Pa.C.S. §§ 6101-6122. We vacate the September 20, 2018 order vacating the July 23, 2018 judgment, and remand for reinstatement of the July 23, 2018 judgment finding Wilson guilty of ICC and for sentencing.

Wilson declined counsel at both the ICC hearing and the sentencing hearing, and represented himself *pro se*. In a prior memorandum, we held that the trial court erred by not conducting an on-the-record colloquy of

*Retired Senior Judge assigned to the Superior Court.

Wilson's waiver of his statutory right to counsel[1] that comported with Pa.R.Crim.P. 121, and we remanded for the trial court to conduct a hearing to determine whether Wilson desired to proceed *pro se* or with counsel in this appeal, after advising Wilson of his right to counsel in accordance with Rule 121. **Commonwealth v. Wilson**, 217 A.3d 439 (Pa. Super. 2019) (unreported memorandum).

Such a hearing occurred on June 7, 2019, and Wilson invoked his right to counsel. However, the trial court neither determined whether Wilson was indigent nor appointed counsel before returning the record to this Court. On August 13, 2019, this Court directed the trial court to appoint counsel for Wilson if it determined that Wilson was indigent. The trial court determined Wilson was indeed indigent based upon his incarceration in a state correctional institution and appointed counsel. Preston T. Younkins, Esquire, from the Armstrong County Office of the Public Defender, entered his appearance in this Court on August 15, 2019. This Court issued a briefing schedule to provide Wilson with the opportunity to file an appellee's brief by September 30, 2019. Even though this Court provided notice to Wilson via Attorney Younkins, Wilson did not avail himself of the opportunity to file a brief or request an extension of time in which to file a brief. Since the

---

[1] **See** 23 Pa.C.S. § 6114(b)(3) ("The defendant shall not have a right to a jury trial on a charge of ICC. However, the defendant shall be entitled to counsel.")

- 2 -

deadline to file an appellee's brief has long since passed, this matter is now ripe for our resolution.

In our prior memorandum, we set forth the facts of this case as follows.

> In June 2018, C.J., who lived with Wilson and shares four minor children (Children) with him, filed an emergency PFA petition seeking protection from Wilson. In the petition, she averred that Wilson kept calling her and she would not answer. He showed up at the house demanding that she tell him what he did, and then struck her in the face. According to C.J., when she called out for Children to call 911, Wilson put his hand on her mouth to stop her from yelling. When C.J. and Wilson's five-year-old son tried to protect her, Wilson threw a pogo stick. Emergency PFA Petition, 6/11/2018, at 1.

> On June 8, 2018, a magisterial district judge signed an order granting emergency PFA relief []. Emergency PFA Order, 6/11/2018, at 1. In accordance with section 6110 of the PFA Act, following an *ex parte* hearing, the magisterial district judge found upon good cause that it was necessary to protect C.J. and Children from Wilson. *Id.*; 23 Pa.C.S. § 6110. The magisterial district judge ordered Wilson to: (1) refrain from abusing C.J. and Children; (2) refrain from contacting C.J. and Children; and (3) be evicted from the residence on Orr Avenue in Kittanning, Pennsylvania. Emergency PFA Order, 6/11/2018, at 1. Thereafter, Appellant was served with the emergency PFA order.

> On June 11, 2018, the next business day, C.J. filed *pro se* a PFA petition with a verified statement of abuse. PFA Petition, 6/11/2018. In the PFA petition, she provided more details about the June 8, 2018 incident to which she referred in her emergency PFA petition. *Id.* at 1-2. She also recounted prior abuse by Wilson. *Id.* at 2. In response to C.J.'s petition, the trial court entered a temporary PFA order and scheduled a hearing. Temporary PFA Order, 6/11/2018, at 1-2. However, after two attempts, the sheriff of Armstrong County was unable to serve Wilson with the PFA petition and temporary PFA order. Sheriff's Return, 6/25/2018. Furthermore, on June 20, 2018, C.J. failed to appear for the PFA hearing, prompting the trial

- 3 -

court to dismiss the temporary PFA order and to dismiss the entire PFA matter without prejudice. Order to Dismiss, 6/20/2018, at 1.

Meanwhile, on June 13, 2018, the Commonwealth had filed an ICC complaint against Wilson. ICC Complaint, 6/13/2018, at 1. In the complaint, the Commonwealth accused Wilson of violating the emergency PFA order, stating that after he was served with the emergency PFA order, he called C.J.'s cell phone, used profanity, and yelled at her for obtaining a PFA against him. *Id.*

On July 23, 2018, the trial court conducted a non-jury trial regarding the ICC complaint. Wilson appeared *pro se*. The Commonwealth called two witnesses: Officer Donald Blose of the Kittanning Borough Police Department and C.J. Wilson testified on his own behalf. At the conclusion of trial, the trial court entered an order adjudging Wilson to be in contempt, and ordered him to appear for sentencing. Order, 7/24/2018, at 1.

At the September 20, 2018 sentencing hearing, Wilson again appeared *pro se*. During the hearing, the trial court *sua sponte* vacated the July 24, 2018 order finding Wilson guilty and dismissed the ICC complaint, stating that Wilson had "represented[ed] that the underlying PFA order[,] which gave rise to the [ICC] Complaint[,] ha[d] been dismissed." N.T., 9/20/2018, at 8; Order, 9/20/2018, at 1.

The Commonwealth timely filed a notice of appeal. Both the Commonwealth and the trial court complied with Pa.R.A.P. 1925. The Commonwealth presents one issue on appeal: "Did the trial court err and/or abuse its discretion when it *sua sponte* vacated [Wilson's ICC] conviction and dismissed the complaint at the time of sentencing?" Commonwealth's Brief at 1 [].

**Wilson**, **supra** (unreported memorandum at 1-2) (footnotes omitted; some capitalization altered).

The PFA Act permits a court to hold an individual subject to a protection order in contempt of such order and to punish the defendant in

accordance with the law. 23 Pa.C.S. § 6114(a). This Court has described the elements required for a finding of ICC as follows.

> Where a PFA order is involved, an [ICC] charge is designed to seek punishment for violation of the protective order.... To establish [ICC], the Commonwealth must prove: 1) the order was sufficiently definite, clear, and specific to the contemnor as to leave no doubt of the conduct prohibited; 2) the contemnor had notice of the order; 3) the act constituting the violation must have been volitional; and 4) the contemnor must have acted with wrongful intent.

**Commonwealth v. Brumbaugh**, 932 A.2d 108, 110 (Pa. Super. 2007) (some capitalization altered). "When reviewing a contempt conviction ... we are confined to a determination of whether the facts support the trial court decision. We will reverse a trial court's determination only when there has been a plain abuse of discretion." **Id.** at 111 (citation omitted).

At the ICC hearing, the Commonwealth introduced the following evidence, beginning with Officer Blose's testimony. Officer Blose served Wilson with the emergency PFA order at 2:00 p.m. on June 10, 2018. N.T., 7/23/2018, at 5. Officer Blose hand delivered the order to Wilson in a side alley outside the residence shared by Wilson and C.J. **Id.** at 6. During service, Officer Blose told Wilson that Wilson could have no contact, direct or indirect, with C.J. **Id.** at 5. Specifically, he told Wilson, "don't call her, don't stop by the house, [and] don't have anybody else call her for you, or it would be a violation of the PFA." **Id.** After serving Wilson, Officer Blose went to the front porch of the house. **Id.** He told C.J. that he had served

- 5 -

the emergency PFA order and to call 911 if there were any violations. *Id.*

According to Officer Blose, C.J.

> held up her phone and said, is this a violation? And I said, who is it? And she said, it's [Wilson]. He called me, yelling at me, calling me a bitch. It's him right now. So she put the phone up and let me listen, and I could hear him yelling at her. I could hear his voice. I am familiar with [] Wilson. I've known him for quite a few years. I told her, yeah, that's a violation. I will try to locate him and I will file [an ICC] complaint.

*Id.* The call from Wilson occurred at approximately 2:25 p.m. – just twenty-five minutes after Officer Blose had served Wilson with the emergency PFA order and informed him not to contact C.J. *Id.* at 7. C.J. told Officer Blose that she answered the phone because the call came from a blocked number. *Id.* at 10.

C.J. testified next. After obtaining the emergency order, C.J. initially stayed in her camper in another town. *Id.* at 12. On June 10, 2018, C.J. returned to the shared residence to gather Wilson's clothes,[2] and was present when Officer Blose served Wilson with the PFA outside of the residence. *Id.* at 12-13. After Wilson was served, Wilson left. *Id.* Shortly thereafter, Wilson called C.J. from a number that was different from his usual number. *Id.* at 13. Her phone identified the number as "[u]nknown or blocked[.]" *Id.* at 14. She answered the call and recognized Wilson's

---

[2] C.J. did not indicate whether she did this on her own initiative in anticipation of Wilson's exclusion from the home, or whether she and Wilson remained in contact and he requested her to gather his clothes.

- 6 -

voice. *Id.* She said she did not remember the conversation, but she was sure he called her something derogative and he was upset with her because she had moved their jointly-owned boat to a different location. *Id.* She agreed with Officer Blose that the call came after Wilson had been served with the emergency PFA order. *Id.*

Wilson, representing himself *pro se*, testified in his own defense. According to Wilson, when he was speaking to Officer Blose, C.J. pulled up to the house in her vehicle. *Id.* at 16. Shortly thereafter, Officer Blose served him with the emergency PFA order. He admitted to calling C.J., stating he did so "because she was taking the boat that was in both of our names. … I was trying to work things out with [C.J.] to explain – I mean, why was she taking the boat off the property where it was when nobody needed to do that." *Id.* at 16-17. Wilson also stated that "there is no more PFA involved in the matter or anything like that." *Id.* at 17.

At the conclusion of testimony, prior to entering an order finding Wilson guilty of ICC, the trial court stated, "[w]ell, the order directed you have no contact, direct or indirect. A phone call is direct contact." *Id.* at 18; *see also* Order, 7/24/2018, at 1.

Approximately two months later, Wilson appeared for sentencing. According to the notes of testimony, the sentencing hearing lasted a total of eight minutes. The Commonwealth did not request a specific sentence, but requested that the trial court consider the "very rocky relationship" between

Wilson and C.J., his pending charges for assaulting C.J. and their son, his newly-acquired charges of conspiracy for obstruction of justice and witness intimidation regarding his alleged attempt to prevent C.J. and their son from testifying in the assault matter, and his pattern of violent behavior against C.J. and others.  N.T., 9/20/2018, at 4-5.

The trial court asked Wilson if there was anything he wanted to say. Wilson, who again appeared *pro se*, responded by stating that C.J. had "bonded [him] out" when he was arrested for aggravated assault against another individual, and alleged that he and C.J. "ha[ve] been together ever since."  *Id.* at 6.  He claimed that C.J. wanted to drop the pending simple assault charges against him for assaulting her, but the district attorney threatened to charge C.J. if she dropped the simple assault charges.  *Id.* Wilson then informed the trial court that while C.J. had obtained a PFA order against him, she later "dropped" it, and there was no final order.  *Id.* at 7.

The clerk of court confirmed that there was an order to dismiss the PFA matter on June 20, 2018.  *Id.* at 8.  Immediately upon hearing this, the trial court *sua sponte* entered an order on the record dismissing the ICC complaint and vacating the July 23, 2018 order finding Wilson guilty.  *Id.*; *see also* Order, 9/20/2018, at 1.  The only explanation offered by the trial court on the record at the time was the representation by Wilson that "the underlying PFA order which gave rise to the [ICC complaint] has been dismissed."  *Id.*

The trial court offered the following analysis in its Rule 1925(a) opinion.

> In the instant case, the [trial court] initially determined that the Commonwealth had proven beyond a reasonable doubt that [Wilson] had violated the PFA [o]rder[3] on June 8, 2018,[4] a few minutes after having been served with it. The facts from the non-jury trial indicate that the period during which Officer Blose arrived at [the residence of Wilson and C.J.], served the PFA [o]rder on [Wilson], spoke with C.J., and heard [Wilson's] voice on C.J.'s cellular phone, spanned only a few minutes. Indeed, [Wilson's] testimony indicated that the events occurred almost simultaneously. Nevertheless, [the trial court] concluded that the Commonwealth had carried its burden because it essentially was undisputed that [Wilson] had called C.J. on her cellular telephone after having been served with the PFA [o]rder that prohibited all contact by whatever means.

> At sentencing, the [trial c]ourt discovered, for the first time, that the PFA [o]rder had been dismissed due to C.J.'s failure to appear at the final hearing on June 20, 2018. Thus, the PFA [o]rder was no longer in effect at the time of both trial and sentencing. Given the proximity in time of the service of the PFA [o]rder with the alleged violation, and further considering C.J.'s presence and interactions with [Wilson] as the [o]rder was being served, [the trial court] concluded that the guilty verdict ought not stand because of insufficient evidence to establish that [Wilson] acted with wrongful intent. **Rather, [Wilson] perceived that C.J. acted with ulterior motives in seeking the PFA [o]rder and did not believe she intended to enforce it.** That perception was confirmed when C.J. later failed to appear at the PFA hearing.

---

[3] As we discuss *infra*, it is unclear to which PFA order the trial court is referring.

[4] The date of service of the emergency PFA order is unclear from the record. The order was obtained on June 8, 2018, and Officer Blose testified he served it on June 10, 2018. At any rate, the parties do not dispute that service and the phone call occurred on the same day.

> Although the [trial court] may not, post-verdict, reweigh the evidence, it may consider the issue of the sufficiency of the evidence. *See Commonwealth v. Robinson*, 33 A.3d 89, 94 (Pa. Super. [] 2011). The [trial court] was not at any time, and ought to have been, advised as to the underlying circumstances regarding the parties' relationship and the dismissal of the PFA. In the interests of justice, and to prevent the inclusion of the [trial court] and its resources in what clearly has been an ongoing spectacle of game-playing by these parties, the [trial court] vacated its prior verdict and dismissed the [ICC] complaint. Had the [trial court] been aware at trial, as it should have been, of the insufficiency of the evidence, it would not have entered the original guilty verdict. In the [trial court's] view, justice required that it be vacated. As it is, the Commonwealth continues to litigate the contempt **where the PFA is long abandoned and the parties reside in harmony.**

Trial Court Opinion, 11/6/2018, at 4-5 (one citation omitted) (emphasis added).

On appeal, the Commonwealth argues that the trial court had no authority to change its mind *sua sponte* post-verdict on the basis of a factual re-determination. Commonwealth's Brief at 6 (citing *Commonwealth v. Parker*, 451 A.2d 767, 769 (Pa. Super. 1982)). In the Commonwealth's view, the trial court improperly re-deliberated its original verdict at the sentencing hearing. *Id.* (citing *Commonwealth v. Robinson*, 33 A.3d 89, 94 (Pa. Super. 2011)). This was in error, the Commonwealth posits, because it had proved that Wilson had notice of an order prohibiting contact with C.J., but he knowingly violated the no-contact order within a half-hour of being served with the order, with his only defense being his concern about his boat. *Id.* at 5. Finally, the Commonwealth notes that whether or not a

final PFA order was granted is not relevant to whether Wilson violated a valid emergency PFA by contacting C.J. **Id.** at 6. The Commonwealth requests reinstatement of the ICC judgment and a remand for sentencing. **Id.** at 7.

Before we delve into the merits, we first address the Commonwealth's ability to appeal from the September 20, 2018 order dismissing the ICC complaint and vacating the prior order adjudicating Wilson guilty of ICC without offending Wilson's right to be free from double jeopardy. Such an examination involves a question of law; thus, "our scope of review is plenary and our standard of review is *de novo*." **Commonwealth v. Baldwin**, 158 A.3d 1287, 1292 (Pa. Super. 2017) (citation omitted).

"The Double Jeopardy Clause, applicable to the States through the Fourteenth Amendment, provides that no person shall 'be subject for the same offense to be twice put in jeopardy of life or limb.'" **Commonwealth v. Jackson**, 10 A.3d 341, 344-45 (Pa. Super. 2010) (citing U.S. Const. Amend. V)). "Under the Double Jeopardy Clauses of the United States and Pennsylvania Constitutions, as well as under the Pennsylvania Crimes Code, a second prosecution for the same offense after acquittal is prohibited." **Baldwin**, 158 A.3d at 1292 (citing U.S. Const. Amend. V; Pa. Const. Art. I, § 10; 18 Pa.C.S. § 109(1)). In Pennsylvania, "[i]t is undisputed that double jeopardy attaches to criminal contempt trials." **Commonwealth v. Zerphy**, 481 A.2d 670, 672 n.4 (Pa. Super. 1984) (citing **Cipolla v. Cipolla**, 398

A.2d 1053 (Pa. Super. 1979)). The purpose of the Double Jeopardy Clause is to guarantee

> that the [s]tate shall not be permitted to make repeated attempts to convict the accused, thereby subjecting him to embarrassment, expense[,] and ordeal and compelling him to live in a continued state of anxiety and insecurity as well as enhancing the possibility that even though innocent he may be found guilty.

*U.S. v. Martin Linen Supply Co.*, 430 U.S. 564, 569 (1977) (citation and quotation marks omitted).

Accordingly, "[w]hen a successful post[-]acquittal appeal by the prosecution would lead to proceedings that violate the Double Jeopardy Clause, the appeal itself has no purpose" and is prohibited. *Smalis v. Pennsylvania*, 476 U.S. 140, 145 (1986); *see also Commonwealth v. Feathers*, 660 A.2d 90, 92 (Pa. Super. 1995) (*en banc*) ("No matter how erroneous, a verdict of acquittal cannot be reviewed without putting a defendant twice in jeopardy.").

However, the United States Supreme Court has made a distinction, for double jeopardy purposes, between an appeal from a judgment of acquittal and an appeal from "a post[-]verdict ruling of law by a trial judge." *United States v. Wilson*, 420 U.S. 332, 352-53 (1975). Unlike an appeal from a judgment of acquittal, correcting an error of law post-verdict does not "grant the prosecutor a new trial or subject the defendant to the harassment traditionally associated with multiple prosecutions." *Id.* Accordingly, "when

a judge rules in favor of the defendant after a verdict of guilty has been entered by the trier of fact, the [g]overnment may appeal from that ruling without running afoul of the Double Jeopardy Clause." *Id.*; *see also Smalis*, 476 U.S. at 145 n.8 (explaining that "no double jeopardy problem was presented in *Wilson* because the appellate court, upon reviewing asserted legal errors of the trial judge, could simply order the jury's guilty verdict reinstated; no new factfinding would be necessary, and the defendant therefore would not be twice placed in jeopardy") (citation omitted); *Evans v. Michigan*, 568 U.S. 313, 330 n.9 (2013) (noting the holding in *Wilson* permits appeals by the government if the result the government is seeking is reinstatement of the verdict); *Feathers*, 660 A.2d at 93-94 (holding that the government may appeal from a trial court's post-verdict order finding the evidence insufficient to sustain the jury's verdict and entering a judgment of acquittal in favor of the defendant because an appellate reversal would not necessitate a retrial).

In the instant case, the trial court entered a verdict of guilty. During the sentencing hearing, the trial court, on its own, decided to vacate the verdict and dismiss the ICC complaint. In a similar scenario, this Court has held that the Commonwealth is entitled to appeal such a decision. In *Parker*, the trial court entered a guilty verdict following a bench trial. The defendant did not file a post-verdict motion, but the trial court *sua sponte* entered an order changing the verdict to not guilty. *Parker*, 451 A.2d at

770. In such a situation, "[t]he challenged order is not truly a verdict of acquittal, but an order purporting to change already recorded and docketed verdicts of guilty, entered by a previous order, to verdicts of not guilty." *Id.* Because this Court was only reviewing the procedural propriety of the subsequent order, and vacation of the challenged order would result in a reinstatement of the original guilty verdict, this Court concluded that the Commonwealth's appeal was not barred by double jeopardy. *Id.*

Having decided that the matter is appealable, we turn now to the merits of whether the trial court was entitled to change the verdict *sua sponte* at the sentencing hearing. The trial court suggests that the vacation of the June 20, 2018 order was permissible because it determined at the sentencing hearing that there was insufficient evidence to convict. Trial Court Opinion, 11/6/2018, at 4-5. We disagree.

The Rules of Criminal Procedure provide that "[u]nder extraordinary circumstances, when the interests of justice require, the trial judge may, before sentencing, hear an oral motion in arrest of judgment, for a judgment of acquittal, or for a new trial." Pa.R.Crim.P. 704(B)(1). This Court does not allow such motions to function "as a substitute vehicle for raising a matter that should be raised in a post-sentence motion." *Commonwealth v. Grohowski*, 980 A.2d 113, 115 (Pa. Super. 2009). "Rule 704(B) is intended to allow the trial judge the opportunity to address only those errors so manifest that immediate relief is essential." *Id.* In order for Rule 704(B) to

apply, however, the defendant must make an oral motion. ***Robinson***, 33 A.3d at 94. A trial court cannot act *sua sponte* to change a verdict pursuant to Rule 704(B). ***Id.*** Simply put, "[t]he trial judge cannot alter the verdict based upon a re[-]determination of credibility or a re-evaluation of the evidence." ***Commonwealth v. Gaither***, 513 A.2d 1034, 1035 (Pa. Super. 1986).

In the instant case, the record is clear that Wilson did not make an oral motion pursuant to Rule 704, but rather the trial court acted *sua sponte* after learning that C.J. did not appear for the final PFA hearing. ***See generally*** N.T., 9/20/2018. Therefore, Rule 704 offers no support to the trial court's decision to vacate the guilty verdict.

We observe that a trial court has some ability to modify or rescind an order *sua sponte* pursuant to 42 Pa. C.S. § 5505. That statute permits a court to modify or rescind any order within 30 days after its entry, so long as an appeal from the order had not been permitted or taken. 42 Pa. C.S. § 5505. Section 5505, however, prohibits a court from modifying or rescinding an order where "otherwise provided or prescribed by law." ***Id***. This Court has determined that this language prohibits a trial judge from reconsidering the facts *sua sponte* post-verdict. ***Parker***, 451 A.2d at 770.

In ***Parker***, the trial court *sua sponte* entered an order stating that subsequent to the verdict it had rendered after a bench trial, it had reconsidered the facts, and decided it had reasonable doubts about Parker's

guilt. In considering whether this was permissible on appeal, our Court noted that a trial judge has no more authority over a verdict in a non-jury trial than the judge does over a jury verdict. *Id.* In either situation, "the authority of a trial judge following the recording of a verdict … is limited to consideration of post-trial motions in arrest of judgment or the granting of a new trial."[5] *Id.* This Court pointed out that "[h]ad defendant moved for an arrest of judgment, the trial court would have been required to view the evidence in the light most favorable to the Commonwealth as the verdict winner and could not have altered the verdict[] based upon a redetermination of credibility or a re-evaluation of the evidence." *Id.* Thus, once the verdict was recorded, the trial court could not on its own reconsider or reweigh the evidence to change its verdict. *Id.* Since the trial court in *Parker* expressly reconsidered the facts *sua sponte*, it exceeded its authority, and this Court remanded for reinstatement of the guilty verdict.

---

[5] At the time *Parker* was decided, Pa.R.Crim.P. 1124 governed challenges to the sufficiency of the evidence and used terms such as demurrer and motion in arrest of judgment. Rule 1124 was later revised to "eliminate[] the use of the terms 'demurrer' and 'motion in arrest of judgment.'" *Feathers*, 660 A.2d at 92. In their place, the rule used "'motion for judgment of acquittal'" in order to "standardize the terminology used for challenges to the sufficiency of the evidence at all stages of the proceeding, consistent[] with the practice in a majority of the states, as well as under the Federal Rules of Criminal Procedure." *Id.* Rule 1124 was renumbered as Rule 606 and amended effective April 1, 2001. Note to Pa.R.Crim.P. 606. Rule 606 retains the term "motion for judgment of acquittal." Pa.R.Crim.P. 606.

More recently, this Court considered in **Robinson** whether a trial court may change a verdict *sua sponte*. In that case, the trial court had found Robinson guilty of theft by unlawful taking following a bench trial. It sentenced Robinson to 18 months of probation and deferred the issue of restitution to a future hearing. At the restitution hearing, the trial court *sua sponte* vacated Robinson's judgment of sentence and entered a verdict of not guilty, stating that "it had 'failed to give due consideration to the weight of character evidence.'" **Robinson**, 33 A.3d at 91 (record citation omitted).

On appeal, Robinson insisted that the trial court had the authority to change the verdict *sua sponte* because the timeframe for filing post-trial motions and an appeal had not yet expired. This Court disagreed, citing to, *inter alia*, **Parker**. 33 A.3d at 92-94. It further explained that

> a post-verdict court may not reweigh the evidence and change its mind as the trial court did herein. Although a post-verdict judge may question a verdict, his discretionary powers are limited to a determination of whether the evidence was sufficient to uphold the original verdict, and he may not alter the original verdict and substitute a new one. The trial court's verdict must be accorded the same legal effect as a jury verdict. Post-trial, the court cannot re-deliberate as it is no longer the fact finder. Just as jurors are not permitted to testify as to the mental processes that led to their verdict, so is the trial court precluded from testifying as to its flawed thought process as a fact finder.

**Robinson**, 33 A.3d at 94. Accordingly, this Court reversed the order changing the verdict, remanded for reinstatement of the original guilty verdict, and remanded for a hearing to complete the sentencing.

In the instant case, despite the trial court's attempt to couch its decision as a permissible exercise of its authority to rule on the sufficiency of the evidence, it is clear that based on *Parker* and *Robinson*, what the trial court really did was to re-evaluate the evidence *sua sponte* long after its role as factfinder had ended, based upon its assumption that C.J. was manipulating the system.

The elements of ICC are straightforward: a sufficiently definite, clear, and specific order; notice of the order; a volitional act; and wrongful intent. *Brumbaugh*, 932 A.2d at 111. In contempt matters, "wrongful intent can be imputed by virtue of the substantial certainty that [one's actions would place one] in contact with [PFA petitioner] in violation of the PFA Order." *Id.* (finding evidentiary support for possession of wrongful intent where the contemnor, knowing that he was under a PFA order prohibiting contact, accepted the PFA petitioner's invitation to attend a party with her); *Commonwealth v. Lambert*, 147 A.3d 1221, 1227 (Pa. Super. 2016) (finding wrongful intent satisfied by Facebook posts indirectly referencing the petitioner the day following the entry of the PFA order).

As the trial court recognized originally, Wilson plainly admitted contacting C.J. shortly after being served with the PFA order. N.T., 7/23/2018, at 16-17. The evidence presented at the ICC hearing does not support the trial court's later finding that Wilson contacted C.J. due to his belief that C.J. was attempting to manipulate the PFA system. In his own

words, Wilson wanted to work things out with C.J. to prevent her from taking the boat. *Id.*

Even assuming *arguendo* that Wilson believed C.J. was attempting to be manipulative, Wilson's perception of C.J.'s motives simply does not negate his plain intent to violate the order. For purposes of contempt, it is the actions of the defendant that matter, not the actions of the PFA petitioner. **Brumbaugh**, 932 A.2d at 111. The actions of Wilson demonstrated his intent. It is undisputed that Wilson knew that the order prohibited him from contacting C.J., but he ignored the order and called her almost immediately. Furthermore, he used a blocked number[6] and screamed profanities at her. Although the trial court later discounted the possibility that Wilson intended to violate the PFA order based upon the proximity of the violation to service of the PFA, this only highlights Wilson's wrongful intent: he was told he could not contact her but immediately did it anyway. **See Lambert**, 147 A.3d at 1227.

Notwithstanding the trial court's statement otherwise in its Rule 1925(a) opinion, the trial court was or should have been aware that a final

---

[6] Specifically, C.J. testified that because she has Wilson's cell phone number saved in her phone, ordinarily her phone would identify the call as coming from Wilson's cell phone. N.T., 7/23/2018, at 13. However, on this occasion, C.J. was unable to identify the source of the call because the call came from an "unknown or blocked" number, suggesting that some mechanism was used to hide the identity of the caller from C.J. until she answered. *Id.*

- 19 -

PFA had never been entered in the matter because Wilson had informed the trial court at the ICC hearing that he was not subject to a current PFA. **See** N.T., 7/23/2018, at 7. However, what matters is not the whether a PFA order was in effect at the time of the contempt hearing, but whether a valid PFA order was in effect at the time of the alleged contempt. Stated another way, the outcome of the final PFA hearing has no bearing on whether there was a valid order prohibiting contact in effect at the time that Wilson called C.J. For the purpose of contempt, an emergency PFA order prohibiting contact has the same validity as a final PFA order prohibiting contact. **See** 23 Pa.C.S. § 6110(a) (providing authority to hearing officer to grant emergency relief in accordance with section 6108(a)(6) (prohibiting defendant from having any contact with the plaintiff)).

The tenor of the trial court's opinion suggests that what prompted the trial court to re-evaluate the evidence was its disapproval of C.J.'s decision not to appear for the final PFA hearing. Despite an assumption by the trial judge that C.J. did not appear at the final PFA hearing because she had acted manipulatively in obtaining the emergency PFA order, there is absolutely no evidence in the record supporting the trial court's assumption. Nor is there evidence in the record explaining why C.J. did not appear at the final hearing. The only information in the record about the current relations of Wilson and C.J. is a bald unsworn assertion by Wilson that C.J. and Wilson had resumed their relationship and C.J. wished to drop the matter. Even if

- 20 -

that were true, there is no support in the record for the trial court's proclamation that Wilson and C.J. "reside in harmony." Trial Court Opinion, 11/6/2018, at 5. In fact, to the extent the record indicates anything at all, it suggests that the opposite might be true, considering that C.J.'s PFA petition details a history of abuse, *see* PFA Petition, 6/11/2018, at 1-2, and, according to the Commonwealth, Wilson had pending charges of conspiracy for obstruction of justice and witness intimidation based upon an alleged attempt to prevent C.J. and their son from testifying in the assault matter. It is not uncommon for victims of intimate partner violence to remain with or return to their abusers for a myriad of complicated reasons, such as a dire financial situation; a need for housing, help with co-parenting their children, or assistance with a disability; fear of escalating violence or losing their children; religious or cultural beliefs; and/or distorted thinking and unhealthy reliance upon the abuser created by past abuse. ***See e.g.***, *Why Do Victims Stay?*, National Coalition Against Domestic Violence, https://ncadv.org/why-do-victims-stay. Ultimately, even if C.J. and Wilson had resumed their relationship, whether harmoniously or otherwise, their relationship at the time of the sentencing hearing has no bearing upon Wilson's plain intent to violate the emergency PFA order months before.

Accordingly, based upon the trial court's impermissible *sua sponte* re-evaluation of the evidence, we reverse the September 20, 2018 order, and remand for reinstatement of the original guilty judgment and for sentencing.

Order reversed. Case remanded for reinstatement of guilty judgment and sentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 1/31/2020