J-A24009-25

2025 PA Super 250

| VENESSA MELANIE MEDINA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ERICK JOHNROSS GREEN | : | No. 265 MDA 2025 |

Appeal from the Order Entered February 11, 2025
In the Court of Common Pleas of Berks County Civil Division at No(s):
25 396

BEFORE:  DUBOW, J., KUNSELMAN, J., and BECK, J.

OPINION BY BECK, J.:                                    **FILED NOVEMBER 10, 2025**

Venessa Melanie Medina ("Medina") appeals from the order entered by the Berks County Court of Common Pleas ("trial court") denying her petition filed pursuant to the Protection from Abuse ("PFA") Act[1] against Erick JohnRoss Green ("Green").  On appeal, Medina argues that the record does not support several of the findings of fact critical to the trial court's decision and that the court misapplied the law.  Because the record and the applicable law support Medina's assertions, we reverse the trial court's order and remand this matter for further proceedings.

Medina and Green were in a tumultuous, off-and-on romantic relationship for approximately three years that ended in November 2024. During that relationship, they had a child, E.G., born in May 2023.  Shortly

---

[1]  23 Pa.C.S. §§ 6101-6122.

after E.G.'s birth, Medina alleged that Green slapped her across the mouth during an argument and caused bruising on her face.

On August 22, 2023, Green filed a PFA petition against Medina in which he alleged that she physically abused him. Green subsequently apologized to her and withdrew the petition one week later.

In September 2023, Medina alleged that an altercation occurred between them during which Green assaulted Medina after he confessed that he was unfaithful to her. Green punched her several times, grabbed her by the neck, strangled her, and slammed her head on the window of her vehicle. Medina sustained lacerations to her face that required stitches, and bruises to her face, neck, and legs. As a result of this attack, Green was charged with assault. While he was in prison awaiting trial, Medina remained in contact with Green, accepting hundreds of phone calls from him,[2] visiting him virtually and once in person, and contributing money to his prison bank account. The Commonwealth ultimately dropped the charge against Green because Medina was unwilling to testify against him. Upon his release in April 2024, the parties' relationship continued until November 2024.

On November 20, 2024, Medina ended her relationship with Green. On that date, after she broke up with him, Green went to Medina's home and repeatedly banged on her door, demanding she come outside. Medina refused

---

[2] The record reflects that Green called Medina from prison approximately 600 times. N.T., 2/11/2025, at 29.

to come to the door and hid in her bathroom while she called the police. Green proceeded to slash the tires of Medina's car. As a result of this incident, Green was charged with criminal mischief. The Commonwealth dropped the criminal charge after Medina declined to testify against him, but subsequently refiled.[3]

On January 14, 2025, Medina filed the PFA petition underlying this appeal against Green. She included therein details of the September 2023 assault. PFA Petition, 1/14/2025, ¶ 10. She acknowledged that she pressed charges against Green but ultimately did not testify against him in court because she was afraid. *Id.* Medina alleged that after Green got out of jail, his behavior became worse and described his destruction of her property and stalking behaviors on November 20, 2024. *Id.* Medina's request for a PFA order included her three minor children and the minor child she shares with Green, E.G. *Id.* ¶ 4. The trial court granted a temporary protective order and held a hearing on the petition on February 11, 2025.

On February 11, 2025, the trial court denied Medina's request for a final PFA order. She timely appealed to this Court and presents the following issues for review:

1. Did the trial court err as a matter of law and/or abuse its discretion when it failed to properly apply the preponderance of the evidence standard to the facts of the case?

2. Did the trial court err as a matter of law and/or abuse its discretion when it failed to properly apply the [PFA] Act, 23

---

[3] It is unclear from the certified record on appeal the current status of this criminal proceeding.

Pa.C.S.[] § 6101 et. seq., definitions of abuse to the facts of the instant case?

3. Did the trial court abuse its discretion when it determined that [Medina]'s fear of [Green] was not reasonable because the [p]arties had reconciled after the past instances of abuse?

4. Did the trial court err as a matter of law and/or abuse its discretion when it limited Plaintiff to a custody action as her exclusive remedy?

Medina's Brief at 4-5.[4]

Medina's first three issues are related and dispositive of this appeal; we therefore address them together. She argues that the trial court erred in dismissing her PFA petition by failing to apply the preponderance of the evidence standard to facts before it because she provided testimony regarding three separate instances of abuse by Green at the PFA hearing. **See id.** at 15-22. She asserts that the trial court acknowledged that these instances of abuse occurred but then wrongly concluded that Green's actions did not meet the statutory definition of abuse—i.e., that Medina did not possess reasonable fear of bodily injury—because she reconciled with Green after two past instances of abuse. **See id.** at 17-27. Medina maintains that the trial court failed to consider authority from this Court explaining that it is common for victims of an abusive relationship to remain with their partners. **See id.** at 28-35. She further observes that the PFA Act aims to protect plaintiffs regardless of whether they leave an abusive relationship, as there "are

_____

[4] Green did not file an appellee's brief in this case.

- 4 -

countless reasons why a victim of domestic violence may not end their relationship with their abuser and additionally not follow through with criminal prosecution[.]" *Id.* at 32-33.[5]

We review PFA orders pursuant to the following standard:

> In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion. The PFA Act does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence. A preponderance of the evidence standard is defined as the greater weight of the evidence, i.e., enough to tip a scale slightly.

*E.K. v. J.R.A.*, 237 A.3d 509, 519 (Pa. Super. 2020) (citations, quotation marks, and brackets omitted). "[W]e review the evidence of record in the light most favorable to, and grant all reasonable inferences to, the party that prevailed before the PFA court." *Kaur v. Singh*, 259 A.3d 505, 509 (Pa. Super. 2021). "Assessing the credibility of witnesses and the weight to be accorded to their testimony is within the exclusive province of the trial court as the fact finder." *S.G. v. R.G.*, 233 A.3d 903, 907 (Pa. Super. 2020)

---

[5] Philadelphia Legal Assistance ("PLA"), which "provides free legal assistance to low-income Philadelphians and families in civil matters," filed an amicus curae brief in this matter. Amicus Brief at 3. PLA extensively addressed the trial court's determination that Medina did not fear Green because the parties had reconciled after prior assaults and because she chose not to testify against him in his criminal proceedings. *See id.* at 5-19. PLA asserts that the trial court improperly found Medina lacked credibility because she reconciled with Green after he abused her and for deciding not to participate in his criminal prosecution, as academic research discussed in numerous law reviews and legal journals shows that Medina's actions were entirely consistent with how victims of domestic violence behave. *See id.*

(citation, quotation marks, and brackets omitted). "Because we cannot make independent factual determinations, we must accept the findings of the trial court that are supported by the evidence." **W.C.F. v. M.G.**, 115 A.3d 323, 326 (Pa. Super. 2015).

"The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." **E.K.**, 237 A.3d at 519 (quotation marks and citation omitted). The PFA Act defines abuse as follows:

> The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:
>
> (1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.
>
> (2) Placing another in reasonable fear of imminent serious bodily injury.
>
> (3) The infliction of false imprisonment pursuant to 18 Pa.C.S. § 2903 (relating to false imprisonment).
>
> (4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).
>
> (5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S. § 6102(a).

The PFA Act does not define all pertinent terms, but incorporates the meaning ascribed to those left undefined in the Pennsylvania Crimes Code. 23 Pa.C.S. § 6102(b). Of relevance here, bodily injury means "[i]mpairment of physical condition or substantial pain." 18 Pa.C.S. § 2301. Serious bodily injury is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." *Id.* § 901(a).

This Court has held that a trial court may consider past abusive conduct by the defendant against the plaintiff when determining whether to grant a PFA petition. *See Buchhalter v. Buchhalter*, 959 A.2d 1260, 1264 (Pa. Super. 2008). As we explained:

> In light of the protective purposes of the act, it was within the trial court's discretion to hear any relevant evidence that would assist it in its obligation to assess the appellee's entitlement to and need for a protection from abuse order. If the trial court found the testimony to involve events too distant in time to possess great relevance to the case, it could certainly have assigned less weight to the testimony. However, it was not an abuse of discretion for the trial court to hear the evidence. **Past abusive conduct on the appellant's part was a crucial inquiry necessary for entry of a proper order**.

- 7 -

*Id.* (emphasis added, citation omitted); *see also Custer v. Cochran*, 933 A.2d 1050, 1059 n.11 (Pa. Super. 2007) (en banc) (same).

The trial court, in dismissing Medina's PFA petition, determined that although her testimony revealed that Green had previously abused her, she did not possess reasonable fear of imminent serious bodily injury or that Green's course of conduct placed her in reasonable fear of bodily injury. *See* Trial Court Opinion, 4/17/2025, at 7-9. The court explained:

> [Medina] did not demonstrate by a preponderance of the evidence that she was in fear of [Green]'s abuse on November 20, 2024, because [she] lacked credibility. There were too many inconsistencies for [the] court to conclude that [Medina] feared [Green], whether it was her repeated refusal to testify against [him] for crimes he allegedly committed against her despite her alleged fear of him; her substantial monetary and emotional support of [Green] while he was incarcerated despite that same fear; or, most importantly, the suggestion, supported by the text exchange between the parties, that [Green] was not even the perpetrator of the September 2023 assault. All [] the incidents described above led [the trial court] to the opinion that [Medina]'s testimony lacked credibility. In a case entirely based on [Medina]'s testimony, her lack of credibility left [the trial court] with insufficient evidence to conclude that [she] was in need of a final PFA order, even when viewing the evidence in the light most favorable to [her]. …

> \*    \*    \*

> If accepting [Medina]'s allegations as true, there is an argument that [Green] undoubtedly did "intentionally, knowingly or recklessly caus[e] bodily injury," to [her] in May and September 2023, but not on November 20, 2024, the alleged night of the incident causing [Medina] to file the PFA [petition] against [Green] on January 14, 2025. 23 Pa.C.S. §§ 6102(a)(2) & (5). The crux of [Medina]'s current PFA is that these past assaults led to her fearing for her safety on the night of November 20, 2024, when [Green] came to her residence, knocking on the door and yelling for her to come downstairs. Accordingly, while it may be true that

[Green] caused past incidents of bodily injury to [Medina], it does not appear to be the definition under which [she] seeks relief.

This leaves the definitions that describe one person putting another in "reasonable fear of bodily injury," either directly or by a pattern of behavior. As discussed above, [the trial court] considered the central issue of this PFA to be whether, given the past history of abuse between the parties, [Medina] reasonably feared for her safety during the incident of November 20, 2024. Having applied the proper definition of abuse and having considered the testimony as presented, this issue should be denied.

*Id.* (unnecessary capitalization omitted). The trial court was particularly persuaded by Medina's decision to maintain contact with Green while he was in prison:

When [Green] was in prison for the assault charge, [Medina] had the perfect opportunity for [Green] to stay away from her. He was incarcerated, and thus unable to be around her or to contact her unless she chose to allow it. He called her, but she could have refused to accept the call. He messaged her, but she could have refused to respond. Instead, [Medina] chose to accept 600 calls from [Green] and message him on multiple occasions. [Medina] even went so far as to visit him, both virtually and in person. [Medina] even had a chance to ensure that [Green] was in prison and away from her for longer, by testifying at his criminal trial, where he was being accused of assaulting her. Instead, [Medina] refused to testify, the charges were dropped, and [Green] was released. These do not seem like the actions of someone who just wanted [Green] to stay away from her. [Medina] had all the power, while [Green] was incarcerated, to choose to have no contact with her purported abuser. When given all that power, [Medina] made a clear choice—the choice to remain in contact with [Green], who she evidently did not fear.

*Id.* at 11. On this basis, the trial court concluded that "based upon [Medina]'s testimony about [Green]'s past physical abuse of her, her fear of imminent serious bodily harm was not reasonable[.]" *Id.*

- 9 -

To summarize, the trial court's denial of Medina's request for protection was based upon its finding that she did not credibly testify that her fear of Green was reasonable. Although the trial court acknowledged that Green had perpetrated acts of abuse previously against Medina, the court found that her claim of fear on November 20 was not credible because she had reconciled with Green in the interim, including during and after he was incarcerated for assaulting her, and her decision not to testify against him.

Also, for the first time in its 1925(a) opinion, the court discredited Medina's testimony regarding the abuse she sustained at Green's hands in September 2023, relying on an undated text message exchange that occurred between Green and Medina, introduced by Green's counsel during cross-examination of Medina. We address each of these findings in turn.

Beginning with the text message exchange, the record reflects that on an unknown date, Green sent a message to Medina stating: "Shouldn't have been in [G]lenside fighting bitches," to which Medina responded: "lmaooooooooooo." Def.'s Ex. 5. Defense counsel questioned Medina about this text exchange in relation to the September 2023 assault, insinuating that her injuries were caused by an altercation with other women, not by Green— an allegation Medina flatly denied. N.T., 2/11/2025, at 34. Although, in its 1925(a) opinion, the trial court finds that the text message exchange "purportedly occurred in September of 2023, around the same time of the alleged assault," there is no record support for that finding. **See** Trial Court

Opinion, 4/17/2025, at 7. More importantly, the trial court did not credit this evidence or find that Green did not abuse Medina in September 2023 at the hearing. To the contrary, at the hearing, the court accepted Medina's testimony concerning the prior incidents of abuse, stating that despite the dismissal of her petition, the court was not "overseeing [sic] what had happened in the past with the two of you," referencing the September 2023 abuse. N.T., 2/11/2025, at 43.[6] Instead, the court based its decision to deny Medina's request for protection solely on its conclusion that "there is [not] enough here today to give her a protective order since the two of you reconciled your relationship after that incident[.]" **Id.**

The trial court erred as a matter of law in finding that Medina failed to establish her reasonable fear of Green solely because she reconciled with him following past instances of abuse. This rationale is belied by the plain language of the PFA Act, which expressly recognizes that, despite abuse,

---

[6] In fact, at the conclusion of the PFA hearing, the trial court issued "a warning" to Green not to contact Medina unless it was to see his child and not to threaten her. The court stated:

> This is a warning for you, sir. [W]hen you are released, if you contact [] Medina and you try to do anything other than see your child, she is going to come in and refile, and I will see to it that it gets filed before me since I have a history with this case and I will not forget that I am giving you this advice, that you are not to make any threats to her. I would not suggest that when you get released, you just show up at her house.

N.T., 2/11/2025, at 42.

- 11 -

victims may reconcile and even cohabitate with their abusers. **See** 23 Pa.C.S. § 6108(g) ("Resumption of coresidency on the part of the plaintiff and defendant shall not nullify the provisions of the [PFA] order.").

This contention has also been soundly rejected by this Court in cases involving the PFA Act. ***Commonwealth v. Wilson***, for example, involved the Commonwealth's appeal of the trial court's decision to vacate a judgment finding Wilson guilty of indirect criminal contempt for violating a temporary PFA order. ***Commonwealth v. Wilson***, 227 A.3d 928, 931-32 (Pa. Super. 2020). Immediately after he was served with the order, Wilson contacted the victim, his paramour and the mother of his four children, by phone. **Id.** At sentencing, the trial court sua sponte vacated the contempt finding after it learned that there was no final PFA order in effect during the contempt trial because the victim did not appear to testify against Wilson at the final PFA hearing. **Id.** at 932, 934. In fact, she had paid Wilson's bond to have him released from jail for the assault he committed against her and the two were living together at the time of the sentencing hearing. **Id.** at 934. Based upon this turn of events, the trial court found that the PFA action was nothing more than "game-playing" and a manipulation of the legal system, as "the PFA is long abandoned and the parties reside in harmony." **Id.** at 934-35. The court thus found insufficient evidence to support the prior finding of contempt.

On appeal, this Court reversed the trial court's decision to vacate the contempt finding, as the temporary PFA order was in effect when Wilson

violated it by contacting the victim by phone. *Id.* at 939. We also rejected

the basis for the trial court's decision at length:

> The tenor of the trial court's opinion suggests that what prompted the trial court to re-evaluate the evidence was its disapproval of [the victim]'s decision not to appear for the final PFA hearing. Despite an assumption by the trial judge that [the victim] did not appear at the final PFA hearing because she had acted manipulatively in obtaining the emergency PFA order, there is absolutely no evidence in the record supporting the trial court's assumption. Nor is there evidence in the record explaining why [the victim] did not appear at the final hearing. The only information in the record about the current relations of Wilson and [the victim] is a bald unsworn assertion by Wilson that [the victim] and Wilson had resumed their relationship and [the victim] wished to drop the matter. Even if that were true, there is no support in the record for the trial court's proclamation that Wilson and [the victim] "reside in harmony." In fact, to the extent the record indicates anything at all, it suggests that the opposite might be true, considering that [the victim]'s PFA petition details a history of abuse and, according to the Commonwealth, Wilson had pending charges of conspiracy for obstruction of justice and witness intimidation based upon an alleged attempt to prevent [the victim] and their son from testifying in the assault matter. **It is not uncommon for victims of intimate partner violence to remain with or return to their abusers for a myriad of complicated reasons, such as a dire financial situation; a need for housing, help with co-parenting their children, or assistance with a disability; fear of escalating violence or losing their children; religious or cultural beliefs; and/or distorted thinking and unhealthy reliance upon the abuser created by past abuse.** *See e.g.*, Why Do Victims Stay?, National Coalition Against Domestic Violence, https://ncadv.org/why-do-victims-stay.

*Id.* at 940 (emphasis added, some citations omitted).

Subsequently, in *E.K. v. J.R.A.*, this Court admonished a trial court for

egregious and belittling comments made to the parties about the ongoing

abusive relationship between them. Of relevance here, the trial court referred

to the victim as "too dumb to leave" her abuser. *E.K.*, 237 A.3d at 527. In response, we recognized that "the PFA Act protects plaintiffs regardless of whether they leave the relationship, remain in the relationship, or resume the relationship." *Id.* at 528. Relying on *Wilson*, we further observed that "[t]he trial court's comments evince a fundamental misunderstanding of the dynamics of intimate partner violence" and the many and varied reasons victims of abuse reconcile with their abusers. *Id.* (footnote omitted).

The record in the case at bar reflects that, when asked why she reconciled with Green after he assaulted her in September 2023, Medina testified that "he apologized," "said it was a mistake," and the two had just had a baby together.[7] N.T., 2/11/2025, at 26. When her counsel asked her why she filed the PFA petition against Green after the November 20, 2024 incident, Medina testified that "[t]here's plenty of times where he just put his hands on me for no reason, and I'm just sick of it. I just want him to stay away from me." *Id.* at 18. She further explained that she felt [e]motional, scared, and I was going through a lot of emotions[,]" that she is "seeking just

---

[7] The trial court is critical of Medina's testimony in this regard, as Medina did not testify that she remained with Green because she feared him, and instead ostensibly reconciled the relationship "because she seemingly did not fear him and wanted to be with him." Trial Court Opinion, 4/17/2025, at 10. As we observed in *Wilson*, however, there are many different reasons an abuse victim may remain with the abuser, including a desire to coparent, distorted views about the relationship, and an unhealthy attachment. *See Wilson*, 227 A.3d at 940.

for him to just stay away from me[,]" and that she would feel "scared" if the court denied the petition. *Id.*

As reflected in the plain language of the PFA Act, the mere fact of reconciliation does not mean that the petitioner was not a victim of abuse. To the contrary, as reflected in *Wilson*, and later in *E.K.*, it is an unfortunate truth for many victims that intimate partner violence is cyclical in nature. *See* Amicus Brief at 17 ("the research that shows victims of violence leave and return to an abusive relationship on average five times before leaving permanently and that victims face the real risk of separation assault upon leaving their abuser") (citing Sally Goldfarb, *Reconceiving Civil Protection Orders for Domestic Violence: Can Law Help End the Abuse Without Ending the Relationship?*, 29 Cardozo L. Rev. 1487, 1499 (2008); Claye Epperson, *Restoring Balance to Domestic Violence Prosecution After Crawford*, 9 Va. J. Crim. L. 163, 175 (2021)); *see also id.* at 6 ("[E]mbedded in our legal system's approach to [intimate partner violence] is the myth of 'the ideal victim' who leaves her abuser, turns to the legal system for assistance in leaving, and never returns.") (quoting Leigh Goodmark, *Reframing Domestic Violence Law and Policy: An Anti-Essentialist Proposal*, 31 WASH. U. J.L. & POL'Y 39, 45-46 (2009)). As this was the sole basis for the trial court's denial of Medina's PFA petition, we conclude that it was error, as the record otherwise supports a finding that Medina was the victim of abuse at Green's hands.

As stated throughout this decision, the record reflects that Medina testified regarding two other instances of past abuse. She testified that in May 2023, shortly after E.G. was born, Green slapped her across the mouth during an argument, causing bruising to her face, "because he said he didn't like what I was saying." N.T., 2/11/2025, at 15-16, Plaintiff's Ex. 8. Medina further testified about an assault that took place in September 2023 during which Green grabbed her by the neck, punched her several times, strangled her, and slammed her head on the window of her vehicle, all of which occurred while E.G. was watching. *Id.* at 9-10. Medina explained that she was covered in blood, had scratches and bruises on her face, and bruising all over her body. *Id.* at 9-15, Plaintiff's Exs. 1-4, 6-7, 11.

As for the November 20, 2024 incident underlying the PFA petition, Medina testified that she decided to permanently end her relationship with Green, that she went "no contact" with him, and blocked his phone number. *Id.* at 8. Consequently, he became "aggressive and violent." *Id.* Medina explained that Green came to her house that night and that "he was trying to break inside my house, … and then that's why I was freaking out. I was scared because he was banging at my door hooting and hollering outside telling me to open the door and come downstairs." *Id.* at 8-9. She testified that she locked herself in her bathroom and called the police. *Id.* at 9. Medina stated that she later discovered that Green had slashed her tires. *Id.* at 37. Green was criminally charged as a result of this incident. *Id.* at 38.

As the trial court plainly acknowledged, the evidence of record demonstrated that Green physically abused Medina in May and September 2023, and it erred in determining that her fear of Green was not reasonable based on her decision to reconcile with him following the September 2023 incident. *See* Trial Court Opinion, 4/17/2025, at 7-9; N.T., 2/11/2025, at 43. Although the trial court purports to frame its decision as one based on Medina's lack of credibility, the true basis for its decision was her inability to end her relationship with Green in a time the court deemed appropriate. *See* N.T., 2/11/2025, at 43 ("even though I'm dismissing it, it does not mean necessarily that I am overseeing [sic] what had happened in the past with the two of you. I just don't think there is enough here today to give her a protective order since the two of you reconciled your relationship after that incident, okay?"). While we acknowledge it is within the trial court's purview to make credibility determinations, *see S.G.*, 233 A.3d at 907, the sole act of reconciling between instances of abuse, without more, is not alone a basis to find that a PFA petitioner lacked credibility and to deny a request for a final PFA order.[8] *See* 23 Pa.C.S. § 6108(g); *Wilson*, 227 A.3d at 940; *E.K.*, 237 A.3d at 528.

_____

[8] There are many reasons why a trial court may not find a PFA petitioner to be credible. For example, the court may not find the PFA petitioner to be credible based on the body language or demeanor; it may find the defendant to be more credible than the petitioner; there may be physical evidence or other witnesses that negatively impact the petitioner's credibility as to claims of abuse.

Here, like the victim in **Wilson**, Medina's testimony at the PFA hearing detailed a history of significant abuse by Green. **See id.**; **see also** N.T., 2/11/2025, at 8-19. Nevertheless, the trial court in this case determined that Medina did not reasonably fear Green because she struggled to end the relationship, as the trial court repeatedly referenced her decision to continue her relationship with him and remain in contact with him while he was in prison. This decision and its underlying rationale, however, runs afoul of the plain language of the PFA Act and our prior precedent and is error. **See** 23 Pa.C.S.§ 6108(g); **Wilson**, 227 A.3d at 940; **E.K.**, 237 A.3d at 528. Likewise, the trial court's disregard of Green's past acts of abuse is contrary to numerous decisions of this Court that state that "[p]ast acts are significant in determining the reasonableness of a PFA petitioner's fear." **E.K.**, 237 A.3d at 519; **see also Buchhalter**, 959 A.2d at 1264.

Based on the foregoing, we agree with Medina that the trial court erred in denying her PFA petition, as the court misapplied the law and its key factual determinations are not supported by the record. The trial court's findings of fact, which are supported by the record, reflect that Medina was the victim of past instances of Green's abuse, during which Medina sustained significant injuries, caused her to possess, on the night of November 20, 2024, reasonable fear of imminent serious bodily injury and that Green's course of conduct placed her in reasonable fear of bodily injury, sufficient to sustain a finding of abuse by a preponderance of the evidence under 23 Pa.C.S. §

6102(a)(2) and (5). *See E.K.*, 237 A.3d at 520 (upholding the trial court's finding that the plaintiff's fear of imminent serious bodily injury from defendant's current threatening conduct was reasonable based on his past physical abuse of her); *see also K.B. v. Tinsley*, 208 A.3d 123, 128-29 (Pa. Super. 2019) (upholding the trial court's determination that the defendant's past acts of abuse constituted a course of conduct that the placed the plaintiff in reasonable fear of bodily injury). Accordingly, we conclude that the trial court abused its discretion in denying Medina's PFA petition.[9] We therefore reverse the trial court's order denying the PFA petition and remand this matter to the trial court for a determination as to the length of the final PFA order.[10]

Order reversed. Application for Correction of the Record granted. Case remanded with instructions. Jurisdiction relinquished.

_____

[9] Based on our disposition, we need not address Medina's fourth and final issue. We note that this appeal was taken by Medina individually and not on behalf of E.G. or her other minor children. We therefore render no decision as to the request for a PFA on behalf of the children.

[10] On June 20, 2025, Medina filed an "Application for Correction of the Record" in which she requests that this Court order the removal of Defendant's Exhibit 3 from the PFA hearing from the record, as Green never introduced the exhibit at the hearing nor did he move for its admission into the record. Application for Correction of the Record, 6/20/2025, ¶ 7. Because the PFA hearing transcript reflects that Medina is correct, and that Green never moved for the admission of Defendant's Exhibit 3 nor did the trial court ever admit it, we grant Medina's application. *See* N.T., 2/11/2025, at 40; *see also* Pa.R.A.P. 1926(d) ("All other questions as to the form and content of the record shall be presented to the appellate court.").

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 11/10/2025