# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––––––

**No. ACM 40148**

––––––––––––––––––––

**UNITED STATES**
*Appellee*

**v.**

**Devonte R.C. GOLDSMITH**
Master Sergeant (E-7), U.S. Air Force, *Appellant*

––––––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 11 January 2023

––––––––––––––––––––

*Military Judge:* Charles G. Warren.

*Sentence:* Sentence adjudged on 8 April 2021 by GCM convened at Joint Base San Antonio-Lackland, Texas. Sentence entered by military judge on 14 May 2021: Dishonorable discharge, confinement for 84 months, reduction to E-1, and a reprimand.

*For Appellant:* Major Ryan S. Crnkovich, USAF; Major Eshawn R. Rawlley, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major John P. Patera, USAF; Major Zachary T. West, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD and GRUEN, *Appellate Military Judges*.

Senior Judge KEY delivered the opinion of the court, in which Judge ANNEXSTAD and Judge GRUEN joined.

––––––––––––––––––––

This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.

––––––––––––––––––––

KEY, Senior Judge:

A military judge sitting as a general court-martial convicted Appellant, in accordance with his pleas and pursuant to a plea agreement, of three specifications of willfully disobeying a superior commissioned officer, one specification of wrongfully discharging a firearm under circumstances to endanger human life, one specification of communicating a threat, two specifications of assault consummated by a battery, and four specifications of domestic violence in violation of Articles 90, 114, 115, 128, and 128b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 890, 914, 915, 928, 928b.[1] After the military judge announced Appellant's sentence, the convening authority withdrew and dismissed one specification of attempted murder in violation of Article 80, UCMJ, 10 U.S.C. § 880, and one specification of domestic violence in violation of Article 128b, UCMJ, as required by the plea agreement. The military judge sentenced Appellant to a dishonorable discharge, confinement for 84 months, reduction to the grade of E-1, and a reprimand. The convening authority approved the sentence in its entirety, but deferred Appellant's reduction in grade until judgment was entered and waived Appellant's automatic forfeitures for a period of six months.

Appellant raises six issues, specifically whether: (1) a provision in his plea agreement is invalid; (2) the entry of judgment should be corrected; (3) the military judge erred in considering certain matters in a victim's unsworn statement; (4) the convening authority erred by considering victim matters submitted post-trial after the deadline for submission had passed; (5) Appellant's record of trial was incomplete and defective, and (6) Appellant was denied the right to a speedy trial.[2] We have carefully considered issue (6) and find it does not require discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We find no error materially prejudicial to Appellant's substantial rights, and we affirm the findings and the sentence.

## I. BACKGROUND

Appellant and his wife, HG, were married in 2012, and they had two children together. On two occasions during the 2017–2018 timeframe, Appellant assaulted his wife; the two separated after the second assault. Appellant and HG both started seeing other people, but they remained married to each other. Over the course of 2019, Appellant committed various acts of domestic violence

---

[1] Reference to Article 128, UCMJ, 10 U.S.C. § 928, is to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise noted, all other references to the UCMJ, the Rules for Courts-Martial, and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant personally raises issue (6) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

against one woman he was dating, leading to Appellant being ordered to cease contact with this woman in early 2020. Appellant's wife, meanwhile, became pregnant with the child of HS, a man she was seeing. Upset by this fact, Appellant told an acquaintance that he intended to shoot HS in the head. This conversation resulted in Appellant being ordered to stay away from HG's house.

Months later—and one week after the child of HG and HS was born—Appellant discovered that HS was at HG's house. At the time, HG's father, HG's three children, and HS were preparing dinner on her rear patio while one of the children was on a video call with Appellant. Once Appellant realized HS was at the house, he made a comment indicating he intended to confront HS. Appellant armed himself with a handgun, went to HG's house, blew a kiss at her doorbell camera, walked around the side of the house, and fired four bullets into her backyard fence. Because the group had become concerned by Appellant's comment on the video call, they had moved inside by the time Appellant arrived. While inside the house, they heard the gunshots. HG's doorbell camera along with a neighbor's camera caught footage of Appellant arriving at HG's house and blowing the kiss. Appellant returned to his own house where he was apprehended the next day and ordered into pretrial confinement. While Appellant was in confinement awaiting trial, HG divorced him.

## II. DISCUSSION

### A. Appellant's Plea Agreement

Pursuant to the terms of Appellant's plea agreement, the convening authority agreed to dismiss the attempted murder specification (the Specification of Charge I) and one domestic violence specification (Specification 2 of Charge VI) upon announcement of Appellant's sentence. This dismissal was without prejudice, but would "ripen into prejudice upon completion of appellate review where the findings and sentence have been upheld." In the plea agreement, Appellant asserted that he was not waiving "the right to complete sentencing proceedings, and complete and effective exercise of post-trial and appellate rights."

On appeal, Appellant argues the "ripen into prejudice" provision is "void or otherwise unenforceable." Appellant's theory is that if his findings or sentence—as adjudged at his court-martial—are altered in any way on appeal, then the two dismissed specifications would not be dismissed with prejudice. In the absence of a "with prejudice" dismissal, Appellant would be potentially subject to trial on those offenses. Appellant asserts this outcome impairs his right to complete an effective appellate review, rendering the plea agreement term invalid under Rule for Courts-Martial (R.C.M.) 705(c)(1)(B) (prohibiting

agreement terms which deprive an appellant of "the complete and effective exercise of post-trial and appellate rights"). Likening the provision to the sword of Damocles, Appellant claims it "serves as a disincentive from raising meritorious issues that could entitle [him] to relief." As Appellant puts it, he "is left only with the Hobson's choice to forgo an appeal" in order to avoid the risk of further prosecution, as he would be threatened by greater criminal liability in the event he obtains appellate relief.

Appellant does not ask us to void his plea agreement, but to instead recast the provision at issue by deleting the words "where the findings and sentence have been upheld." Such a modification would ostensibly result in the two specifications and Charge I being dismissed with prejudice upon completion of appellate review, regardless of whether the findings and sentence are completely upheld.

The interpretation of a plea agreement's meaning and effect is a question of law that we review de novo. *See United States v. Lundy*, 63 M.J. 299, 301 (C.A.A.F. 2006) (applying de novo review to pretrial agreements). We use the same standard in assessing whether a plea agreement term violates the Rules for Courts-Martial. *See United States v. Hunter*, 65 M.J. 399, 401 (C.A.A.F. 2008) (applying de novo review in the case of pretrial agreements).

Appellant supports his argument by pointing to *United States v. Partin*, 7 M.J. 409 (C.M.A. 1979). In that case, the appellant had been charged with premeditated murder, but the convening authority agreed to "withdraw" that specification in exchange for the appellant's agreement to plead guilty to the lesser-included offense of unpremeditated murder. *Id.* at 410. The "withdrawal" was effected by amending the specification at trial. *Id.* n.1. The pretrial agreement explained that, "should the accused's plea of guilty to unpremeditated murder . . . be changed by anyone to not guilty, the charge of premeditated murder and the referral of the case as capital may be reinstated by the [c]onvening [a]uthority." *Id.* at 411. At the appellant's court-martial, however, the military judge told the appellant that if findings of his guilt were *overturned* on appeal, then the appellant could be tried on the capital murder charge. *Id.* at 412. In a two-judge majority opinion, the United States Court of Military Appeals found the military judge's explanation to be incorrect, insofar as the pretrial agreement addressed the changing of the pleas, but appellate courts do not enter or change pleas. *Id.* Concluding the military judge's explanation was not actually part of the pretrial agreement, the court determined the explanation was "without legal effect" and warranted no relief. *Id.* Despite this conclusion, the court noted that it did "not condone . . . in any way" the provision in the pretrial agreement. *Id.* at 411 n.3. Citing *United States v. McCray*, 7 M.J. 191 (C.M.A. 1979), the court found it "need not address [the

issue] at the present time."[3] *Id.* The court also commented that "if this misinterpretation by the military judge was an actual term of the pretrial agreement, [the appellant's argument that the term imposed an impermissible burden on his appeal rights] may have merit."[4] *Id.* at 412. In a concurring opinion, Judge Cook wrote, "I disagree with the inference in note 3 of the principal opinion that a convening authority cannot require final judicial acceptance of a plea of guilty as a condition to effectuation of the pretrial agreement with the accused."[5] *Id.* at 413 n.* (Cook, J., concurring in the result).

We are not convinced the language in *Partin* carries as much legal force as Appellant claims, as the Court of Military Appeals seemingly distanced itself from the language just two years later in *United States v. Mills*, 12 M.J. 1 (C.M.A. 1981). In *Mills*, the appellant had entered into a pretrial agreement in which the convening authority agreed to remit a portion of the appellant's sentence, but the agreement would be canceled in the event an appellate court ordered a rehearing. *Id.* at 2. Thus, the effect of this particular provision would have been to subject the appellant to the risk of serving the originally adjudged sentence should the appellant obtain appellate relief requiring a rehearing. By the time of this decision, one of the two judges in the *Partin* majority had been replaced by Judge Everett. Judge Everett authored the *Mills* opinion and was joined by Judge Cook, who had expressed his disagreement in *Partin*, for a new two-judge majority. The court noted that cases cited in *Partin* focused on "prosecutorial vindictiveness," but also concluded that it "cannot approve an agreement between an accused and the convening authority which would tend to

---

[3] The reason for the court's reliance on *McCray* is somewhat opaque, as that case stood for the proposition that legally incorrect statements about waiver in a pretrial agreement do not necessarily result in prejudice to an accused who is pleading guilty. 7 M.J. 191 (C.M.A. 1979).

[4] The court cited several opinions in support of this proposition, but it is unclear how those opinions relate to the facts of *Partin*. For example, one of the cases is *North Carolina v. Pearce*, in which the United States Supreme Court concluded it would be a constitutional due process violation "to follow an announced practice of imposing a heavier sentence . . . for the explicit purpose of punishing the defendant for his having succeeded in getting his original conviction set aside." 395 U.S. 711, 723–24 (1969). *Pearce* dealt with the retrial of a defendant on the same charges which had been set aside. The *Partin* court also cited *Blackledge v. Perry*, but that case—like *Pearce*—addressed prosecutorial vindictiveness, albeit in terms of adding more serious charges after the defendant exercised his statutory right to request a de novo trial. 417 U.S. 21, 28 (1974). The appellant in *Partin* did not allege any act of vindictiveness on the Government's part, nor has Appellant in this case.

[5] This judge also commented, "I disagree with, and am uncertain about the meaning of, a number of statements in the principal opinion." *United States v. Partin,* 7 M.J. 409, 413 (C.M.A. 1979) (Cook, J., concurring in the result).

inhibit the exercise of appellate rights." *Id.* at 4. The court upheld the pretrial agreement provision, but only after reframing it so that the provision only subjected the appellant to an increased maximum punishment should a rehearing be ordered *and* the appellant refused to enter into a stipulation of expected testimony, as he had done at his original court-martial. *Id.* at 5. Now in the minority, the dissenting judge wrote that he would have found the provision unlawful. *Id.* at 8 (Fletcher, J., concurring in part and dissenting in part). Thus, the comment in *Partin* about not condoning the pretrial agreement term seems to provide little in the way of a concrete foundation for Appellant's argument, especially in light of the fact the *Partin* court upheld the agreement. Reading *Partin* and *Mills* together, what is prohibited is prosecutorial vindictiveness after a successful appeal or—arguably—an agreement provision which would subject an accused to a higher sentence based solely on an appellate court's decision to order a rehearing. Neither of these situations is presented in Appellant's case.

We recognize a provision in a plea agreement which deprives an appellant of "the complete and effective exercise of post-trial and appellate rights" is invalid. R.C.M. 705(c)(1)(B). But we also recognize that convening authorities may withdraw and dismiss specifications, and such "does not bar later reinstitution of the charges" so long as jeopardy has not attached. R.C.M. 705(b)(2)(C), Discussion. Because a convening authority may withdraw a specification before jeopardy attaches and then re-refer it at some point in the future—regardless of the existence of a plea agreement, the accused's pleas, or an appellant's success on appeal—we see no obvious reason why a convening authority may not agree to dismiss specifications with prejudice so long as the remaining specifications are upheld during appellate review. If anything, such an agreement operates to an appellant's benefit, as it creates the opportunity for that appellant to see withdrawn specifications dismissed with prejudice. In the absence of such an agreement, a convening authority would be free to simply dismiss specifications without prejudice and allow them to be revived at some later date—the same position Appellant faces should the findings in his case be disturbed on appeal.

Furthermore, an accused is entitled to waive a broad swath of rights, and doing so has the plain potential to negatively impact his or her ability to mount an appeal. For example, military courts recognize "the general principle of criminal law that an unconditional plea of guilty waives all nonjurisdictional defects at earlier stages of the proceedings." *United States v. Hardy*, 77 M.J.

438, 442 (C.A.A.F. 2018) (citation and internal quotation marks omitted).[6] Indeed, a guilty plea resulting in conviction "waives any objection, whether or not previously raised, insofar as the objection relates to the factual issue of guilt." R.C.M. 910(j). This concept of waiver-by-plea has operated to waive appellate review of the denial of discovery requests, *United States v. Jones*, 69 M.J. 294, 296 (C.A.A.F. 2011); the denial of a motion to disqualify trial counsel, *United States v. Bradley*, 68 M.J. 279, 282 (C.A.A.F. 2010); most multiplicity issues, *United States v. Campbell*, 68 M.J. 217, 220 (C.A.A.F. 2009); and virtually all suppression motions, Mil. R. Evid. 311(e). Similarly, an accused may waive a variety of issues mid-court-martial by asserting he or she has no objection or otherwise assents to certain matters, such as alleged errors related to stipulations of expected testimony, *United States v. Campos*, 67 M.J. 330, 332–33 (C.A.A.F. 2009); findings instructions, *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020); evidence admissibility, *United States v. Eslinger*, 70 M.J. 193, 200 (C.A.A.F. 2011); and credit for prior punishment, *United States v. Haynes*, 79 M.J. 17, 19–20 (C.A.A.F. 2019).

In the context of plea negotiations, an accused may agree to waive all waivable motions, at least so long as the accused understands what he or she is doing. *United States v. Gladue*, 67 M.J. 311, 314 (C.A.A.F. 2009). In this case, the military judge explained that the convening authority was withdrawing the specifications, which meant that they were "taken away here at this court-martial for now," but that once the findings and sentence were upheld on appeal, then the specifications would be dismissed with prejudice and could "never be brought against [Appellant] again." The military judge twice asked Appellant if he understood, and Appellant answered both times that he did. Appellant has not asserted he did not actually understand the provision at the time of his plea or that he was misled as to its legal effect, and nothing in the record would support such a claim if he had.

The typical pretrial agreement involves the "accused fore[going certain] constitutional rights . . . in exchange for a reduction in sentence or other benefit." *United States v. Lundy*, 63 M.J. 299, 301 (C.A.A.F. 2006). Here, Appellant essentially accepted the risk of being tried by court-martial on the two dismissed specifications should his findings and sentence not remain intact during appellate review. On the other hand, he secured the convening authority's promise to dismiss those specifications with prejudice if the findings and sentence are upheld. While we understand such a scenario might lead Appellant to question whether or not to raise certain issues on appeal, it was Appellant

---

[6] We recognize our obligation to assess the entire record of any case presented to us and "to determine whether to leave an accused's waiver intact, or to correct the error." *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016).

who agreed to this particular provision, and he does not claim he was coerced into doing so.

Although not evaluating the Rules for Courts-Martial, the United States Supreme Court has determined that the possibility of receiving a higher sentence during a retrial following a successful appeal "does not place an impermissible burden on the right of a criminal defendant to appeal or attack collaterally his conviction" so long as the second sentence is not "a product of vindictiveness." *Chaffin v. Stynchcombe*, 412 U.S. 17, 35 (1973). We find this analogous to the situation faced by Appellant. As the Supreme Court has noted, "The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow." *Id.* at 32 (quotation marks and citation omitted).

Considering the foregoing, we cannot conclude the provision operated to deprive Appellant of his ability to completely and effectively exercise his appellate rights. Appellant would surely be in a better position had the convening authority agreed to dismiss the specifications with prejudice during Appellant's court-martial and without waiting to see the outcome of the appellate process, but Appellant is not entitled to the most advantageous plea agreement. Rather, Appellant is owed the benefit of the bargain he negotiated with the convening authority.

Not only was Appellant not deprived of his ability to completely and effectively exercise his appellate rights, we see no evidence the plea agreement provision impacted those rights at all. Appellant has raised six issues on appeal, and—for two of these issues—he asks us to set aside his sentence. For the third, he asks us to set aside both the findings and his sentence. Thus, whatever pressure Appellant may have felt by virtue of the plea agreement provision, it has not stopped him from asking for the very sort of relief which would relieve the convening authority of the obligation to dismiss the two specifications with prejudice. In other words, even if the plea agreement provision was legally unenforceable, and in light of our conclusions in this case, Appellant has failed to demonstrate any prejudice. We decline Appellant's invitation to modify his plea agreement or grant other relief for this alleged error.

## B. Entry of Judgment

Because we grant no relief to Appellant with respect to the plea agreement provision discussed above, we turn to Appellant's claim that the entry of judgment is inaccurate and requires correction. In a column titled "F," the entry of judgment indicates that Charge I and its specification along with Specification 2 of Charge VI were "[w]ithdrawn and dismissed after arraignment (without prejudice)." Appellant argues this description fails to explain that prejudice will ripen upon completion of appellate review, and he asks us to remand his

case and order the entry of judgment be modified to so reflect. Although Appellant has not identified any requirement for the document to include this additional language, the Government "acknowledges that corrective action is needed." Rather than remand the case, however, the Government asks this court to modify the entry of judgment. In light of the parties' agreement that modification is called for, we will accept the Government's recommendation and modify the entry of judgment in our decretal paragraph pursuant to our authority under R.C.M. 1111(c)(2).

## C. HG's Unsworn Statement

Appellant's ex-wife, HG, was called as a witness by trial counsel during presentencing proceedings in support of the Government's case in aggravation. She testified about the 2017 assault in which Appellant held her down by pushing his forearm into her neck while he tried to take her phone from her. HG testified that she could not breathe and "was panicking" during the assault. She also testified about Appellant assaulting her in 2018 by slapping her face in the presence of their two children. HG said this latter assault "[j]ust added to [her] lack of trust, lack of feeling safe around [Appellant]." HG recounted that Appellant threatened to kill her boyfriend, HS, as well as that Appellant came to her house and shot at her fence. She explained the emotional toll the events had taken on her and her children and described her persistent concerns for her safety.

After the Government rested, HG sought to present an unsworn statement pursuant to her rights under Article 6b, UCMJ, 10 U.S.C. § 806b, and R.C.M. 1001(c). The written statement not only elaborated on the two assaults and the shooting incident at HG's house, but also indicated Appellant had physically abused HG throughout most of their marriage, beginning in 2013. The Defense objected to large sections of the proposed unsworn statement, leading to about half of the statement being redacted. Trial counsel agreed to almost all the redactions.

The military judge, however, overruled the Defense's objection to these two lines: "[Appellant] spent all these years trying to convince me that each incident wasn't that bad, and that I wasn't remembering correctly. On one occasion he would admit what he did and apologize, but then on another occasion he would try to tell me that it happened differently." In objecting, trial defense counsel argued the "two sentences constitute accusations of further mistreatment, not victim impact."

Under R.C.M. 1001(c)(5)(A), a crime victim may provide an unsworn statement to the court-martial which is oral, written, or both. The contents of the statement are limited to victim impact and matters in mitigation. R.C.M.

1001(c)(3). "Victim impact" is defined to "include[ ] any financial, social, psychological, or medical impact on the crime victim directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001(c)(2)(B).

In overruling the Defense's objection, the military judge focused on the phrase "directly relating to or arising from" in the definition of "victim impact" in R.C.M. 1001(c)(2)(B). He noted that this phrase was essentially the same as that found in R.C.M. 1001(b)(4), which limits the Government's evidence in aggravation to "any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty." The military judge explained that case law interpreting the latter rule permitted "commentary on a continuing course of conduct so long as the victim had a qualifying . . . financial, social, psychological, or medical impact from that course of conduct." From there, the military judge concluded the concept of a "continuing course of conduct" applies to victim unsworn statements in the same way the concept applies to the Government's aggravation evidence.

We review a military judge's decision to admit an unsworn victim statement for an abuse of discretion. *United States v. Edwards*, 82 M.J. 239, 244 (C.A.A.F. 2022). Military judges abuse their discretion when their "factual findings are clearly erroneous, view of law is erroneous, or decision is outside the range of reasonable choices." *United States v. Hutchins*, 78 M.J. 437, 444 (C.A.A.F. 2019) (citations omitted).

Military courts have recognized the principle that uncharged misconduct which is part of "a continuous course of conduct involving the same or similar crimes, the same victims, and a similar situs within the military community" may be admitted as evidence in aggravation, because such evidence is directly related to the conduct which resulted in conviction. *United States v. Mullens*, 29 M.J. 398, 400 (C.M.A. 1990). In *Mullens*, the accused had been charged with sexually abusing his children on numerous occasions between 1983 and 1986; the stipulation of fact in that case discussed "uncharged identical acts with the same children" between 1979 and 1983 at a different duty station.[7] *Id.* at 399. Similarly, in *United States v. Nourse*, 55 M.J. 229 (C.A.A.F. 2001), the United States Court of Appeals for the Armed Forces (CAAF) upheld the admission of other conduct in a case involving the larceny of ponchos from a sheriff's office. Although the accused in *Nourse* was charged with and convicted of a single larceny of property worth $2,256.00, the Government introduced evidence of

---

[7] The Court of Military Appeals did not dwell on the fact the offenses occurred in two different states, concluding instead that the "situs" of both the charged and uncharged offenses was "the servicemember's home." *United States v. Mullens*, 29 M.J. 398, 400 (C.M.A. 1990).

other larcenies from the same office of property valued at $30,000.00 and that the accused had sold items to a military surplus store around the same time. *Id*. at 230. In concluding the military judge had not abused his discretion in admitting the evidence, the CAAF explained it pertained to "the same crime upon the same victim in the same place" and was "admissible to show the full impact of [the accused's] crimes upon the [s]heriff's [o]ffice." *Id*. at 232.

We agree with the military judge's conclusion that the "continuous course of conduct" theory found in aggravation cases applies to a victim's right to be heard at sentencing under R.C.M. 1001(c). Like the military judge, we note the "directly relating to or arising from" language in R.C.M. 1001(c)(2)(B) is nearly identical to "directly relating to or resulting from," which relates to aggravation evidence in R.C.M. 1001(b)(4). Considering victim-statement rights were added to the *Manual for Courts-Martial* in 2015,[8] decades after military courts linked the concept of "continuous course of conduct" to evidence in aggravation, we can presume the President's incorporation of substantially the same language in the former in another provision of the very same rule was with the intent of incorporating the legal theories applicable to the latter. Similarly, the logical force behind admitting continuous-course evidence in aggravation— that is, to show the full impact of an accused's crimes—seems equally applicable to victim statements. To the extent the Government is permitted to demonstrate how an accused's offenses have impacted a particular victim, we see no valid argument for preventing a victim from explaining the same in his or her own words.

Appellant asserts the two scenarios are not analogous because an accused may test the Government's aggravation evidence with cross-examination, while a victim giving an unsworn statement cannot be questioned upon it. The problem with this argument is that a victim exercising his or her right to be heard may do so through either an unsworn or sworn statement, only the latter of which permits cross-examination by both trial and trial defense counsel. R.C.M. 1001(c)(4–5). Under a plain reading of R.C.M. 1001(c), what may be contained in a victim statement and the definition of "victim impact" apply equally to unsworn and sworn statements. Thus, we see little support for Appellant's theory on this point. We also note that an accused facing uncharged misconduct in an unsworn victim statement is not so hamstrung as Appellant suggests, given that such an accused is free to rebut the allegations as well as emphasize to the court-martial that the victim's information was neither provided under oath nor subject to cross-examination.

---

[8] *See* Analysis of Rules for Courts-Martial, *Manual for Courts-Martial, United States* (2016 ed.), App. 21, at A21-72.

We conclude the broad victim rights contained in R.C.M. 1001(c) include permitting a victim to discuss a continuous course of conduct of an accused when such course of conduct is directly related to or arises from an offense against that victim of which an accused has been found guilty.

The next question is whether the language in HG's unsworn statement qualifies as permissible subject matter for her presentation to the court-martial. We conclude it does. Although most of the specifics of HG's previous physical abuse were redacted from her statement after Defense objection, unobjected-to portions of her statement make it clear her marriage to Appellant was tarred by abuse almost from its inception. In the statement ultimately accepted by the military judge, HG wrote: "I can't explain why I stayed in a physically, and mentally abusive situation for so long. I can't remember any period of time where our relationship was healthy." The portion the Defense objected to, but was overruled, merely states Appellant "spent all these years trying to convince [HG] that each incident wasn't that bad," and that he alternated between apologizing to HG and accusing her of remembering incidents incorrectly. At the most, this passage hints at other "incidents," but provides no detail. Assuming *arguendo* this passage suggests specific incidents of uncharged assaults, such amounts to allegations of the same sort of offenses committed against the same victim in the context of their marriage. The information places Appellant's charged offenses—and their impact on HG—in context by demonstrating that the charged offenses did not occur in isolation, but were part and parcel of a long-running abusive relationship. We are well aware of the often-complex nature of domestic violence cases,[9] and we are mindful that portraying abusive episodes as isolated incidents runs the risk of misleading a court-martial by eliminating much, if not all, of the context of the abuse.[10] Under the facts presented here, HG apparently suffered repeated abuse at Appellant's hands during their marriage, and that abuse is directly related to the physical abuse of which Appellant was convicted as well as his firing of his gun into HG's fence. In sum, we conclude the military judge did not abuse his discretion in overruling the Defense's objection.

---

[9] *See, e.g.*, *Commonwealth v. Wilson*, 227 A.3d 928, 940 (Pa. Super. 2020) ("It is not uncommon for victims of intimate partner violence to remain with or return to their abusers for a myriad of complicated reasons." (citation omitted)).

[10] We have previously explained, however, that victim-impact statements are not vehicles for presenting "a never-ending chain of causes and effects." *United States v. Dunlap*, No. ACM 39567, 2020 CCA LEXIS 148, at *20 (A.F. Ct. Crim. App. 4 May 2020) (unpub. op.) (quoting *United States v. Rust*, 41 M.J. 472, 478 (C.A.A.F. 1995)), *rev. denied*, 80 M.J. 347 (C.A.A.F. 2020).

Even if we had concluded the military judge erred, no relief would be warranted due to the absence of any perceptible prejudice. The objected-to language in HG's statement essentially accuses Appellant of attempting to gaslight HG about unspecified "incidents." Given Appellant's egregious misconduct, which included physically assaulting two women on multiple occasions, threatening to kill HS, then going to HG's house—in violation of orders to stay away—and discharging a firearm in the immediate vicinity of not just HS and HG, but Appellant's two small children and HG's newborn child, the passage in the unsworn statement is almost entirely insignificant in comparison. After carefully considering the factors set out in *United States v. Barker*, 77 M.J. 377, 384 (C.A.A.F. 2018), we conclude the inclusion of the passage did not substantially influence Appellant's adjudged sentence, and he would be entitled to no relief even if the inclusion was in error.

## D. Post-trial Matters Submitted by HS

Once a court-martial sentence is announced, a victim may submit matters to the convening authority for consideration in deciding what action, if any, to take on the court-martial's findings and sentence "within ten days after the sentence is announced." R.C.M. 1106A(a), 1106A(e)(1). "If . . . the crime victim shows that additional time is required . . . to submit matters, the convening authority may, for good cause, extend the period for not more than 20 days." R.C.M. 1106A(e)(3)(A). If a victim fails to submit matters within these time periods, the victim's right to submit such matters is waived. R.C.M. 1106A(f)(1). Once a victim submits matters, the convening authority is required to ensure the matters are "provided to the accused as soon as practicable." R.C.M. 1106A(c)(3). An accused, in turn, has five days after receiving a victim's matters to respond to them (a period which also may be extended). R.C.M. 1106(d)(3). The convening authority is required to consider any matters "timely submitted" by either an accused or a victim under these rules prior to deciding whether to take action in a case. R.C.M. 1109(d)(3)(A). The convening authority may also consider "[s]uch other matters as the convening authority deems appropriate." R.C.M. 1109(d)(3)(B)(iv). However, "the convening authority may not consider matters adverse to the accused that were not admitted at the court-martial . . . unless the accused is first notified and given an opportunity to rebut." R.C.M. 1109(d)(3)(C)(i).

Appellant's court-martial concluded on 8 April 2021, and his victims were notified that same day via written memoranda of their right to submit matters. The memorandum HS received reads, in part, "your matters are due no later than 18 April 2021.[11] If you need additional time, you may request one twenty-day extension from the convening authority. Any matters received after the

---

[11] We take judicial notice that 18 April 2021 was a Sunday.

prescribed time limit may not be considered by the convening authority." HS signed the memorandum, acknowledging receipt. Below that acknowledgement, HS indicated he was "submitting the attached matters," an indication which is dated 20 April 2021. The staff judge advocate also signed the memorandum, noting that HS had provided matters, and this annotation is also dated 20 April 2021.[12]

HS's statement is about half a page long and expresses HS's view that Appellant did not deserve any relief from his sentence. HS also wrote, "[Appellant] intentionally violated military and civilian protective orders. He has a lack of respect for authority and the laws which we are governed by." On 23 April 2021, Appellant's trial defense counsel signed for receipt of the statement.

Appellant was also notified on 8 April 2021 of his right to submit matters to the convening authority. In that notification, trial counsel advised Appellant: "The victims in your case are also being afforded a chance to submit written matters to the convening authority . . . . Any matters submitted by a victim will be forwarded to you so that you may rebut them, if you so choose." Appellant submitted a request for clemency to the convening authority dated 18 April 2021. In that request, Appellant asked the convening authority to: (1) defer his adjudged forfeitures[13] and reduction in grade until the entry of judgment; (2) waive his automatic forfeitures for six months; and (3) reduce the amount of confinement pertaining to one specification of violating a protective order (or recommend this court do so).[14]

In a memorandum dated 5 May 2021, the convening authority approved Appellant's adjudged sentence in its entirety while also deferring his reduction in grade and waiving his automatic forfeitures for a period of six months, as Appellant had requested. The convening authority noted she had considered matters "timely submitted" both by Appellant and by two of his victims. R.C.M. 1104(b)(2)(B) permits parties to file motions to correct errors in a convening authority's action within five days of receiving the action, but Appellant filed no such motion.

---

[12] The Government does not contest Appellant's assertion that HS submitted his statement on 20 April 2021. We will assume HS did, in fact, submit his statement on that date.

[13] No forfeitures were adjudged by the court-martial.

[14] Appellant was sentenced to four months of confinement for this particular specification, and that period of confinement was to be served consecutively with other periods of confinement pursuant to both the plea agreement and the ultimate judgment entered by the military judge.

On appeal, Appellant argues HS submitted his matters after the ten-day window passed and without requesting an extension of time, and those matters therefore should not have been considered by the convening authority. He explains there was "no need" to rebut HS's statement at the time it was submitted because the statement was late and therefore "a nullity."[15] Appellant points to the fact the convening authority did not grant him any relief from his sentence to confinement on the one specification and suggests the convening authority might have been swayed by HS's statement. Appellant asks us to remand his case "to resolve a substantial issue with the post-trial processing in his case" as relief.

We review alleged errors with respect to post-trial processing de novo. *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000). When an appellant fails to file a post-trial motion regarding a convening authority's action under R.C.M. 1104, then that appellant's right to object to the accuracy of the action is forfeited absent plain error. *United States v. Miller*, 82 M.J. 204, 207 (C.A.A.F. 2022). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *Id*. at 207–08 (citation omitted).

Although the convening authority's memorandum in this case indicates she considered matters which were "timely submitted" by the victims—and HS's statement was not timely, insofar as it was submitted outside of the ten-day window set out in the Rules for Courts-Martial and the memorandum HS received—we will assume the convening authority did, in fact, consider HS's statement before taking action.[16] The Rules for Courts-Martial, however, do not clearly prohibit a convening authority from considering victim matters submitted late. Under R.C.M. 1106A, a crime victim may submit matters within ten days after the sentence is announced, the convening authority may—for good cause—extend the period for "not more than 20 days," and the failure to submit matters within the prescribed timeframe "waives the right to submit such matters." R.C.M. 1106A(e)(1), 1106A(e)(3), 1106A(f)(1). On its face, R.C.M. 1106A describes the rights of victims and a time limit for victims to exercise those rights. Arguably, the rule simply delineates the minimum rights

---

[15] Appellant also takes issue with various comments in HS's statement. For example, Appellant argues he was not actually attacked at his court-martial as having a lack of respect for authority, even though he admitted to violating several orders issued by his superiors. We have carefully considered Appellant's claims regarding the substantive contents of HS's statement and conclude they are without merit.

[16] We reach this conclusion, in part, due to the absence of any indication the convening authority or the staff judge advocate rejected HS's submission or considered whether an extension was required.

a convening authority must grant victims with respect to their post-trial matters and does not serve to constrain that convening authority from granting more expansive rights. This interpretation is somewhat undercut, however, by the inclusion of the "not more than 20 days" language, which seems to establish an absolute upper limit on the amount of time a victim may be afforded to submit matters—at least under this particular rule. The rule also only makes the additional 20 days available when there is "good cause" to do so, further constraining a convening authority's discretion, at least under R.C.M. 1106A. Notwithstanding this arguable constraint, we also find significant that R.C.M. 1106A does not contain any language prohibiting convening authorities from considering late-submitted victim matters or directing that convening authorities may *only* consider matters submitted within the rule's timeframes; instead, the rule states that victims who miss their deadline waive their rights to submit such matters. R.C.M. 1106A(f)(1).

Appellant would have us conclude R.C.M. 1106A and R.C.M. 1109 operate to absolutely bar consideration of any victim matters not "timely submitted" under the R.C.M. 1106A deadlines. We decline to adopt this interpretation, as a convening authority may consider matters submitted by a victim outside the R.C.M. 1106A timeframes under R.C.M. 1109(d)(3)(B)(iv). This provision permits a convening authority to consider "[s]uch other matters as the convening authority deems appropriate." The protection afforded an accused under this provision is analogous to the protection under R.C.M. 1106A: the convening authority must provide any new matters to the accused and give the accused an opportunity to rebut information contained therein. R.C.M. 1109 places no restrictions on what "such other matters" may entail, so long as those matters are deemed "appropriate" by the convening authority. It would be counterintuitive to provide convening authorities essentially *carte blanche* authority to consider outside-the-record matters while simultaneously prohibiting consideration of any victim matters which happen to fall outside of the R.C.M. 1106A deadlines. Nor can we fathom any sort of principled rationale for drawing such a distinction. We find a more logical reading of R.C.M. 1106A and R.C.M. 1109 as requiring convening authorities to consider timely submitted victim matters; once a victim misses the time prescribed under R.C.M. 1106A, a convening authority has the discretion to either consider the matters or decline to do so. This reading harmonizes victims' rights to submit post-trial matters with convening authorities' rights to consider any matters deemed "appropriate."

Even if we concluded the convening authority errantly considered HS's submission, Appellant can show no prejudice, as he was given the opportunity to respond to that submission and opted not to do so. We give little credence to Appellant's suggestion that he might have believed the convening authority was only considering "timely submitted" matters and therefore did not feel it was necessary to respond, in large part because Appellant does not allege he

was actually misled. Nor does he explain what he would have included in any response. In short, if Appellant wanted to ensure the convening authority did not consider HS's statement, he should have either responded to the statement when it was submitted or filed a post-trial motion within five days of receiving the convening authority's action. Appellant's failure to take either action is strong evidence that Appellant simply elected not to respond to HS's submission, further minimizing any potential prejudice.

**E. Record of Trial**

Appellant argues he deserves relief because he did not receive several discs with his copy of his record of trial. We are unpersuaded.

In addition to the audio recording of the court-martial, Appellant's record of trial includes seven discs. Four of the discs are attachments to Prosecution Exhibit 1, the stipulation of fact, and these discs are labeled as Attachments 3, 4, 5, and 17 to the stipulation. Of those four discs, two are doorbell camera footage of Appellant the night he shot HG's fence; one is a video recording of Appellant threatening to kill HS; and one is a recording of a voicemail message Appellant left in violation of one of his no-contact orders. The fifth disc is an attachment to Appellate Exhibit X (the Government's response to a defense motion to suppress), labeled "Ring Doorbell Footage." The sixth and seventh discs are attachments to Appellate Exhibit XVIII (a defense motion to preclude certain evidence) and consist of two recordings of law enforcement interviews.

Appellant's court-martial concluded on 8 April 2021, and he signed for receipt of his record of trial about a month and a half later, on 18 May 2021. Appellant avers—and we see no evidence to the contrary—that the copy of the record he received while he was initially being held at a civilian confinement facility only included a single disc. According to Appellant, this disc included recordings of two law-enforcement interviews and video footage from one of HG's neighbor's doorbell cameras, along with other unspecified files which "were not in a compatible format."

In May 2022, Appellant was transferred to the Naval Consolidated Brig at Joint Base Charleston, South Carolina. His record of trial was forwarded in early June, but when it arrived, it contained no discs. After Appellant requested assistance obtaining the discs from his appellate defense counsel, the Government provided him with six of the seven discs on 27 June 2022.[17] According to Appellant—and verified by a brig legal officer—some of the files on

---

[17] The missing disc was Attachment 17 to the stipulation of fact (the voicemail message related to the no-contact order). The relevant content of the voicemail is included in the text of the stipulation of fact admitted at Appellant's court-martial and included in the record of trial.

the discs could not be opened with the software on the computer Appellant was authorized to use. Nevertheless, Appellant filed his assignments of error brief with this court on 30 June 2022.

In mid-July 2022, the Government provided Appellant with three new discs after ensuring the files on the discs could be opened by the software Appellant was using. Appellate government counsel also submitted another declaration from the legal officer in which she said Appellant received the new discs and that she was "aware of no further complaints from [Appellant] that the files on the discs are inoperable."[18] The Government filed its answer to Appellant's assignment of errors on 29 August 2022, and Appellant filed a reply brief on 13 September 2022. The reply brief does not mention the discs or further discuss Appellant's claim that his record of trial was defective.

Whether a record is complete is a question of law we review de novo. *United States v. Davenport*, 73 M.J. 373, 376 (C.A.A.F. 2014). We also review post-trial processing under the same standard. *United States v. Sheffield*, 60 M.J. 591, 593 (A.F. Ct. Crim. App. 2004) (citing *United States v. Kho*, 54 M.J. 63 (C.A.A.F. 2000)).

A complete, certified record of proceedings shall be kept for each general or special court-martial which results in a punitive discharge. Articles 54(a) and 54(c)(2), UCMJ, 10 U.S.C. §§ 854(a), 854(c)(2). A copy of the record "shall be given to the accused as soon as it is certified." Article 54(d), UCMJ, 10 U.S.C. § 854(d). Exhibits admitted in evidence as well as appellate exhibits are to be included in the record. R.C.M. 1112(b)(6).

We have reviewed the record of trial filed with this court, and it contains all the discs identified by Appellant. Thus, the actual record of trial is complete. The copy Appellant received, however, was missing certain attachments to one exhibit and to two different motions. Therefore, Appellant's copy of the record was incomplete, and the question is whether Appellant should be granted relief. Appellant asks us to set aside his sentence or, alternatively, to order the Government to serve a complete record on Appellant.

We do not think either form of relief is warranted, because Appellant has not demonstrated he has suffered any prejudice. Appellant argues that not receiving a complete record "hinders his ability to fully assist in his appeal and raise other potential matters pursuant to [*United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982)]," but Appellant has never asked this court to grant him an enlargement of time in order to obtain and review the discs in question. Perhaps more significantly, Appellant's appellate counsel concede the copy of the record in their possession has always included working copies of all seven discs.

---

[18] The declaration was signed on 12 August 2022.

This tells us that Appellant's counsel, at a minimum, could have discussed the contents of the discs with Appellant, if not provided him a copy outright. Fatal to Appellant's claim of prejudice, however, is the fact that Appellant received new copies of the discs in the middle of July 2022, yet he did not file his reply until the middle of September 2022. This tells us that in those two months, Appellant was unable to find anything pertinent in the discs to support any additional claim of error. As noted above, Appellant did not ask for additional time to review the discs. Based upon the absence of prejudice, we will not set aside Appellant's sentence. In light of the fact Appellant now possesses six of the discs and the functional equivalent of the seventh, we will not order the Government to serve Appellant with a redundant record.

### III. CONCLUSION

The entry of judgment is modified as follows: The wording in the "F" column for Charge I and its specification, and for Specification 2 of Charge VI, is modified to add the words "to ripen into dismissal with prejudice upon completion of appellate review where the findings and sentence have been upheld" after the words "(without prejudice)." The findings and sentence as entered by the military judge and modified by this opinion are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court